**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| Hewlett-Packard Company, | |
| Plaintiff, | |
| v. | CASE NO. |
| LG Electronics, Inc.; LG Electronics USA, Inc.; Hitachi-LG Data Storage, Inc.; Hitachi-LG Data Storage Korea, Inc.; Koninklijke Philips N.V.; Lite-On IT Corporation of Taiwan; BenQ Corporation; Philips BenQ Digital Storage; BenQ America Corporation; Philips & Lite-On Digital Solutions Corporation; Philips & Lite-On Digital Solutions USA, Inc.; Pioneer Corporation; Pioneer North America, Inc.; Pioneer Electronics (USA) Inc.; Pioneer High Fidelity Taiwan Co., Ltd.; Sharp Corporation; and Pioneer Digital Design & Manufacturing Company, | DEMAND FOR JURY TRIAL |
| Defendants. | |

## COMPLAINT

Plaintiff Hewlett-Packard Company ("HP") hereby brings this action for damages and injunctive relief under federal and state antitrust laws against Defendants, demanding trial by jury, and alleges as follows:

## NATURE OF THE ACTION

1.     HP brings this action to recover for injury to its business and property arising from billions of dollars of purchases of optical disk drives ("ODD") at artificially inflated prices over several years.  Defendants and their co-conspirators participated in a price-fixing conspiracy from at least as early as January 1, 2004, through at least January 1, 2010 (the "Conspiracy

Period").  The purpose and effect of this anticompetitive conspiracy was to fix, raise, stabilize, and maintain prices for ODDs.  Pursuant to this price-fixing conspiracy, Defendants and their co-conspirators engaged in a series of integrated and overlapping anticompetitive acts.  These anticompetitive acts included rigging bids for ODDs in procurement events that HP conducted and in procurement events that other original equipment manufacturers ("OEM") conducted; exchanging confidential information, including information relating to pricing, sales, production, bidding strategies and rankings, pull rates, and total available market ("TAM"), in order to facilitate price coordination; entering into agreements to set prices for ODDs sold to OEMs based in the United States, including HP; and allocating customers and markets.  HP paid higher prices for ODDs than it would have paid in a competitive market as a direct result of Defendants' and their co-conspirators' unlawful conduct.  HP seeks to recover damages for its ODD purchases from Defendants and their subsidiaries, affiliates, and co-conspirators during the Conspiracy Period.

2.      An ODD uses a laser to read or write data to or from an optical disc.  ODDs can be internal drives manufactured to be incorporated into notebook and desktop computers, or they can be external drives that attach to computers by means of an external interface, such as a Universal Serial Bus ("USB") connection.  ODDs utilize the following optical disc formats: compact discs ("CD"), such as CD-ROMs or CD-recordable/rewritable discs ("CD-R/RW"); digital versatile discs ("DVD"), such as DVD-ROMs or DVD-recordable/rewritable discs ("DVD±R/RW"); Blu-ray products, such as Blu-ray discs ("BD") and Blu-ray-recordable/rewritable discs ("BD-R"/"BD-RW"); and high definition DVDs ("HD-DVD").  Super multi-drives or other combination drives play various of the foregoing media.  These formats are described in greater detail below.

3.      ODDs can be manufactured according to varying specifications.  For example, ODDs are available in different heights, such as half-height ("HH"), slim, and ultra-slim, and use different types of interfaces to connect to a computer's motherboard, such as Parallel Advanced Technology Attachment ("PATA") and Serial Advanced Technology Attachment ("SATA").

4.      ODDs that are external drives are sold alone, typically with some sort of connecting interface.  ODDs that are internal drives are used inside of products such as computers.  ODDs are also widely used in computers to read and write data for a variety of uses, including software programs and data compilations.

5.      During the Conspiracy Period, ODDs served as one of the principal means for recording and reading music, movies, and other digital data.  During that time, Defendants' and their co-conspirators' sales of ODDs generated billions of dollars in annual revenues and expanded exponentially with the increased utilization of computers and other products in households and businesses throughout the United States.  Until very recently, almost all forms of home entertainment and data storage were on optical discs.  Most computers that are used or sold in the United States today come equipped with an ODD.  During the Conspiracy Period, Defendants and their co-conspirators controlled more than 90 percent of the ODD market.

6.      The United States Department of Justice (the "DOJ") is investigating price-fixing in the ODD market.  The DOJ's investigation already includes an application for amnesty by one group of conspirators named herein.  Many Defendants and co-conspirators named in this Complaint have a history of engaging in anticompetitive conduct, including price-fixing conduct for electronic component parts used in computers that HP manufactured and sold, such as dynamic random access memory ("DRAM"), thin-film transistor liquid-crystal display ("TFT-LCD") panels, and cathode ray tubes ("CRT").

7.      On November 8, 2011, the United States of America and Defendant Hitachi-LG Data Storage, Inc. ("HLDS, Inc."), an ODD manufacturer, entered a plea agreement in criminal proceedings against HLDS, Inc.  HLDS, Inc. is a joint venture between Co-conspirator Hitachi, Ltd. and Defendant LG Electronics, Inc.  In its plea agreement, HLDS, Inc. admitted that it had engaged in felonious price-fixing conduct with co-conspirators in violation of Section 1 of the Sherman Act.  In its plea agreement, HLDS, Inc. admitted that between approximately November 2005 and approximately March 2009, HLDS, Inc. employees engaged in bid-rigging and price-fixing in the ODD industry, a primary purpose of which was to "rig ODD procurement events hosted by HP."  The United States agreed not to prosecute most HLDS, Inc. employees, but explicitly carved out Young Keun Park, Sang Hun Kim, Sik Hur (also known as Daniel Hur), and Woo Jin Yang (also known as Eugene Yang), each of whom subsequently pled guilty to antitrust violations relating to the ODD industry.

## JURISDICTION AND VENUE

8.      HP brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief and under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover damages, including treble damages, for the injuries that HP sustained as a result of Defendants' and their co-conspirators' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as costs of suit and reasonable attorneys' fees.

9.      HP also brings this action under the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq.*, and the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, to obtain injunctive relief and damages, including treble damages, for the injuries that HP sustained as a result of Defendants' and their co-conspirators' violations of federal and state antitrust and unfair competition laws, as well as costs of suit and reasonable attorneys' fees. HP has a significant presence in California and maintains its worldwide headquarters in

California.  In addition, as the parent corporation that reports consolidated financial results, HP suffered financial injury from the conspiracy described herein in California.  Furthermore, during the Conspiracy Period, Defendants and their co-conspirators maintained agents and representatives in California who supported sales of ODDs to customers, including HP, in California and elsewhere.

10.     This Court has subject matter jurisdiction over HP's federal antitrust claims pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.  This Court has supplemental jurisdiction over HP's claims under the California Cartwright Act and the California Unfair Competition Law pursuant to 28 U.S.C. § 1367.  These state law claims are so related to HP's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

11.     The activities of Defendants and their co-conspirators, as described herein, involved U.S. import trade or commerce or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on Unites States domestic and import trade or commerce, including commerce in California and in Texas.  This anticompetitive effect gives rise to HP's antitrust claims.  During the Conspiracy Period, Defendants' and their co-conspirators' conspiracy adversely affected the prices of ODDs in the United States, which moved through, were sold in, or used in California and in Texas.  In particular, Defendants' and their co-conspirators' conspiracy directly and adversely affected the prices of ODDs that HP negotiated and agreed upon in the United States.

12.     This Court has jurisdiction over each Defendant named in this action under Section 12 of the Clayton Act, 15 U.S.C. § 22.  Defendants and their co-conspirators purposely availed themselves of the laws of the United States.  In particular, among other things, each

Defendant transacted business in the United States, including in California and in Texas; directly or indirectly sold or marketed throughout the United States, including in California and in Texas, substantial quantities of price-fixed ODDs and products containing price-fixed ODDs, which they knew would be sold to customers in the United States; had substantial aggregate contacts with the United States as a whole, including in California and in Texas; or was part of an illegal conspiracy to engage in cartel activity, as described herein, that was directed at and was intended to have and did have a direct, substantial, and reasonably foreseeable effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in the United States, including in California and in Texas.

13.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d) because each Defendant is an alien corporation, transacts business in this district, or is otherwise found within this district.  In addition, venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to HP's claims occurred in this district, including online Internet and offline negotiation events, whereby HP purchased ODDs, and a substantial portion of the affected interstate trade and commerce was carried out in this district.  Defendants and their co-conspirators knew that price-fixed ODDs would be sold and shipped into this district. Furthermore, during the Conspiracy Period, Defendants and their co-conspirators maintained agents and representatives in Texas who supported sales of ODDs to customers, including HP, in Texas and elsewhere.

## PARTIES

**PLAINTIFF**

14.     Plaintiff Hewlett-Packard Company is a corporation organized under the laws of the State of Delaware, with its principal place of business in Palo Alto, California.  HP is a

leading information technology company and is the largest personal computer ("PC") company in the world, employing over 300,000 employees.  HP maintains its worldwide headquarters in Palo Alto, California and other facilities in the United States, including most of its supply chain procurement operation in Houston, Texas.  HP sells numerous products that incorporate ODDs, including desktop and notebook computers.  HP is the parent corporation in the United States that reports consolidated financial results involving its subsidiaries.

15.     During the Conspiracy Period, HP purchased price-fixed ODDs directly from Defendants and their co-conspirators, or Defendants' and their co-conspirators' subsidiaries and affiliates, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, co-conspirators, or co-conspirators' subsidiaries and affiliates.  As a direct result of Defendants' and their co-conspirators' unlawful conduct, HP suffered injury to its business or property.

16.     During the Conspiracy Period, HP conducted its technical pre-qualification process for ODDs in the United States; issued invitations for procurement events to qualified suppliers in the United States; and selected suppliers from which to purchase ODDs in the United States.  HP held frequent negotiations with Defendants and their co-conspirators on the price and volume of ODDs that it purchased.  HP held negotiations by multiple methods, including online Internet negotiations.  These negotiations were conducted in the United States, including in Cupertino, California and in Houston, Texas.  The price agreed upon in the United States that resulted from the negotiation process in the United States was a worldwide price that applied to all of HP's ODD purchases for the given time period, regardless of where the ODD was to be delivered.

17.     The guilty plea that HLDS, Inc. entered and press releases that the DOJ issued have specifically identified HP as a victim of price-fixing for its purchases of ODDs.

18.     HP has effectuated assignments of claims with its relevant subsidiaries and affiliates, whereby any of the antitrust claims described in this Complaint against Defendants and their co-conspirators that HP's subsidiaries and affiliates hold, have been assigned to HP.  These subsidiaries and affiliates include Hewlett-Packard Asia Pacific Pte. Ltd.; Hewlett-Packard GmbH; Hewlett-Packard International Pte. Ltd.; Hewlett-Packard Japan, Ltd.; and Hewlett-Packard Mexico, S.de R.L.de C.V.  These subsidiaries and affiliates issued purchase orders for ODDs from suppliers that HP selected in the United States, at prices resulting from negotiations that HP conducted in the United States.

**HLDS DEFENDANTS**

19.     Defendant LG Electronics, Inc. is a business entity organized under the laws of South Korea, with its principal place of business at Twin Tower South 128, Yeoui-daero, Yeoungdeungpo-Gu, Seoul, 150-721, South Korea.  LG Electronics, Inc. controls an integrated global enterprise comprising itself and other entities, including Hitachi-LG Data Storage, Inc. and Hitachi-LG Data Storage Korea, Inc.  During the Conspiracy Period, LG Electronics, Inc. manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

20.     Defendant LG Electronics USA, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey, 07632.  LG Electronics USA, Inc. is a wholly-owned subsidiary of LG Electronics, Inc.  During the Conspiracy Period, LG Electronics USA, Inc. manufactured, sold, and/or distributed ODDs throughout the United States and imported ODDs into the United States.

21.     Defendants LG Electronics, Inc. and LG Electronics USA, Inc. are referred to individually and collectively herein as "LG."  All of the entities referred to as LG participated in the collusive conduct described herein, either directly or as represented by other members of the LG entities.

22.     Defendant Hitachi-LG Data Storage, Inc. ("HLDS, Inc.") is a business entity organized under the laws of Japan, with its principal place of business at 4F MSC Center Building, 22-23 Kaigan 3-Chome, Minato-Ku, Tokyo, 108-0022, Japan.  HLDS, Inc. was formed in November 2000 as a joint venture between Hitachi and LG Electronics, Inc., in which Hitachi has a 51 percent ownership interest and LG Electronics, Inc. has a 49 percent ownership interest. It began operations in January 2001.  During the Conspiracy Period, HLDS, Inc. manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

23.     Defendant Hitachi-LG Data Storage Korea, Inc. is a business entity organized under the laws of South Korea, with its principal place of business at LG Gasan Digital Center, 459-9 Gasan-dong, Geumcheon-gu, Seoul, 153-803, South Korea.  Hitachi-LG Data Storage Korea, Inc. is part of the joint venture formed in November 2000 between Hitachi and LG Electronics, Inc., in which Hitachi has a 51 percent ownership interest and LG Electronics, Inc. has a 49 percent ownership interest.  During the Conspiracy Period, Hitachi-LG Data Storage Korea, Inc. manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

24.     Defendants HLDS, Inc. and Hitachi-LG Data Storage Korea, Inc. are referred to individually and collectively herein as "HLDS."  All of the entities referred to as HLDS

participated in the collusive conduct described herein, either directly or as represented by other members of the HLDS entities.

**PLDS DEFENDANTS**

25.     Defendant Koninklijke Philips N.V. ("Royal Philips") is a Dutch company, with its principal place of business at Groenewoudseweg 1, Einhoven, 5261BA, the Netherlands. During the Conspiracy Period, Royal Philips controlled an integrated global enterprise comprising itself and other entities, including Philips & Lite-On Digital Solutions Corporation and Philips & Lite-On Digital Solutions USA, Inc.  Royal Philips manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

26.     Defendant Lite-On IT Corporation of Taiwan ("Lite-On") is a business entity organized under the laws of Taiwan, with its principal place of business at 12F, 392, Ruey Kuang Road, Neihu, Taipei, 114, Taiwan, R.O.C.  Lite-On controls an integrated global enterprise comprising itself and other entities, including Philips & Lite-On Digital Solutions Corporation and Philips & Lite-On Digital Solutions USA, Inc.  During the Conspiracy Period, Lite-On manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

27.     Defendant BenQ Corporation is a business entity organized under the laws of Taiwan, with its principal place of business at 16 Jihu Road, Neihu, Taipei, 114, Taiwan, R.O.C. BenQ Corporation controls an integrated global enterprise comprising itself and other entities, including BenQ America Corporation.  In February 2003, BenQ Corporation and Royal Philips formed Defendant Philips BenQ Digital Storage ("PBDS"), a joint venture intended to manufacture and distribute ODDs, in which Royal Philips had a 51 percent ownership interest

and BenQ Corporation had a 49 percent ownership interest.  In April 2006, Lite-On acquired

BenQ Corporation's ODD business and eventually replaced BenQ Corporation in PBDS, which

was reconstituted as Defendant Philips & Lite-On Digital Solutions Corporation in March 2007.

During the Conspiracy Period, BenQ Corporation, separately or through PBDS, manufactured,

sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be

imported into the United States.

28.      Defendant BenQ America Corporation ("BenQ America") is a corporation

organized under the laws of the State of California, with its principal place of business at 15375

Barranca Parkway, Suite A205, Irvine, California, 92618.  BenQ America is a wholly-owned

subsidiary of BenQ Corporation.  During the Conspiracy Period, BenQ America manufactured,

sold, and/or distributed ODDs throughout the United States and imported ODDs into the United

States.

29.      Defendants BenQ Corporation and BenQ America are referred to individually and

collectively herein as "BenQ."  All of the entities referred to as BenQ participated in the

collusive conduct described herein, either directly or as represented by other members of the

Ben-Q entities.

30.      Defendant Philips & Lite-On Digital Solutions Corporation is a business entity

organized under the laws of Taiwan, with its principal place of business at 16F, 392, Ruey

Kuang Road, Neihu, Taipei, 114, Taiwan, R.O.C.  Established in March 2007, Philips & Lite-On

Digital Solutions Corporation is a joint venture between Royal Philips and Lite-On.  Philips &

Lite-On Digital Solutions Corporation's operations include design, development, sales,

marketing, customer support, and service of ODDs.  During a portion of the Conspiracy Period,

Philips & Lite-On Digital Solutions Corporation manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

31.     Defendant Philips & Lite-On Digital Solutions USA, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 42000 Christy Street, Fremont, California, 94538.  Philips & Lite-On Digital Solutions USA, Inc. is a subsidiary company of Philips & Lite-On Digital Solutions Corporation.  Philips & Lite-On Digital Solutions USA, Inc. serves customers in the North America and Latin America regions. During a portion of the Conspiracy Period, Philips & Lite-On Digital Solutions USA, Inc. manufactured, sold, and/or distributed ODDs to customers throughout the United States and imported ODDs into the United States.

32.     Defendants Philips & Lite-On Digital Solutions Corporation and Philips & Lite-On Digital Solutions USA, Inc. are referred to individually and collectively herein as "PLDS." All of the entities referred to as PLDS participated in the collusive conduct described herein, either directly or as represented by other members of the PLDS entities.

**PIONEER DEFENDANTS**

33.     Defendant Pioneer Corporation is a business entity organized under the laws of Japan, with its principal place of business at 1-1 Shin-ogura, Saiwai-ku, Kawasaki-shi, Kanagawa, 212-0031, Japan.  Pioneer Corporation controls an integrated global enterprise comprising itself and other entities, including Pioneer North America, Inc.  During the Conspiracy Period, Pioneer Corporation manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

34.     Defendant Pioneer North America, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1925 East Dominguez Street,

Long Beach, California, 90810.  Pioneer North America, Inc. is a wholly-owned subsidiary of Pioneer Corporation.  During the Conspiracy Period, Pioneer North America, Inc. designed, manufactured, and/or distributed ODDs throughout the United States.

35.     Defendant Pioneer Electronics (USA) Inc. ("Pioneer USA") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 1925 East Dominguez Street, Long Beach, California, 90810.  Pioneer USA is a wholly-owned subsidiary of Pioneer North America, Inc.  During the Conspiracy Period, Pioneer USA designed, manufactured, and/or distributed ODDs throughout the United States.

36.     Defendant Pioneer High Fidelity Taiwan Co., Ltd. is a business entity organized under the laws of Taiwan, with its principal place of business at 13th Floor, No. 44, Chung Shan North Road, Sec. 2, Taipei, Taiwan, R.O.C.  During the Conspiracy Period, Pioneer High Fidelity Taiwan Co., Ltd. designed and/or manufactured ODDs with the intent and agreement to distribute throughout the United States.

37.     Defendants Pioneer Corporation, Pioneer North America, Inc., Pioneer USA, and Pioneer High Fidelity Taiwan Co., Ltd. are referred to individually and collectively herein as "Pioneer."  All of the entities referred to as Pioneer participated in the collusive conduct described herein, either directly or as represented by other members of the Pioneer entities.

38.     Defendant Sharp Corporation ("Sharp") is a business entity organized under the laws of Japan, with its principal place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka, 545-8522, Japan.  During the Conspiracy Period, Sharp manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

39.     Defendant Pioneer Digital Design & Manufacturing Company ("PDDM") is a business entity organized under the laws of Japan, with its principal place of business at 1-1

Shin-ogura, Saiwai-ku, Kawasaki-shi, Kanagawa, 212-0031, Japan.  PDDM is a joint venture between Pioneer Corporation and Sharp, in which Pioneer Corporation has a 66 percent ownership interest and Sharp has a 34 percent ownership interest.  During the Conspiracy Period, PDDM manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

40.     The conduct alleged herein was carried out by Defendants' and their co-conspirators' officers, agents, employees, or representatives, while engaged in the usual management of their business.

41.     Defendants are also liable for acts done in furtherance of the conspiracy by companies they acquired through mergers and acquisitions.

42.     When HP refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, HP is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts on behalf of every company in that family.  In fact, the individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish among the entities within a corporate family.  The individual participants entered into agreements on behalf of their respective corporate families.  As a result, the entire corporate family was represented by their agents with respect to such conduct and was party to the agreements reached by such agents.

43.     Each Defendant acted as the agent of, co-conspirator with, or joint venturer of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for ODDs made by its parent company.

## AGENTS AND CO-CONSPIRATORS

44.     The acts alleged against Defendants and their co-conspirators in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' and their co-conspirators' businesses or affairs.

45.     Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of, or for, the other Defendants or co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.  Each Defendant or co-conspirator that is a subsidiary of a foreign parent acted as the United States agent for ODDs made by its parent company.

46.     Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.  These co-conspirators are believed to include Hitachi, Ltd.; Toshiba Corporation; TAIS; TACP; Samsung Electronics; SEA; TSST; Sony Corporation; Sony Electronics, Inc.; NEC; Sony Optiarc Inc.; Sony NEC Optiarc Inc.; Sony Optiarc America Inc.; Panasonic; TEAC; and Quanta entities, in each case as described below.

47.     Co-conspirator Hitachi, Ltd. ("Hitachi") is a business entity organized under the laws of Japan, with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.  Hitachi controls an integrated global enterprise comprising itself and other entities, including Hitachi-LG Data Storage, Inc. and Hitachi-LG Data Storage Korea, Inc. During the Conspiracy Period, Hitachi manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

48.     Co-conspirator Toshiba Corporation is a business entity organized under the laws of Japan, with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo, 105-8001, Japan.  Toshiba Corporation controls an integrated global enterprise comprising of itself

and other entities, including Toshiba Samsung Storage Technology Corporation, Toshiba

Samsung Storage Technology Corporation Korea, Toshiba America Information Systems, Inc.,

and Toshiba America Consumer Products LLC ("TACP").  During the Conspiracy Period,

Toshiba Corporation manufactured, sold, and/or distributed ODDs throughout the United States

and directly caused ODDs to be imported into the United States.

49.     Co-conspirator Toshiba America Information Systems, Inc. ("TAIS") is a

corporation organized under the laws of the State of California, with its headquarters at 9740

Irvine Boulevard, Irvine, California, 92718.  TAIS is a wholly-owned and controlled subsidiary

of Toshiba America, Inc., which is in turn a wholly-owned subsidiary of Toshiba Corporation.

During the Conspiracy Period, TAIS manufactured, sold, and/or distributed ODDs throughout

the United States and imported ODDs into the United States.  During the Conspiracy Period,

TACP also manufactured, sold, and/or distributed ODDs throughout the United States and

imported ODDs into the United States.

50.     On July 1, 2010, TACP was merged into TAIS.  Toshiba Corporation's 2009

Annual Report contains a letter from Norio Sasaki (President and CEO of Toshiba Corporation)

and Atsutoshi Nishida (Toshiba Corporation's Chairman) that refers to the "Toshiba Group" and

its "Group-wide efforts" to carry out a profitability action plan "set up with the key objectives of

transforming Toshiba Group into a Group with a strongly profitable business structure."  The

Annual Report contains an organization chart depicting Toshiba Corporation's board and

President and CEO exercising control and reporting authority over multiple product segment

subgroups, including the "Digital Products Group," which has responsibility for storage devices

and personal computers.  The Annual Report lists Toshiba Samsung Storage Technology

Corporation and TAIS as overseas "Consolidated Subsidiaries."  Incorporated in the Annual

Report, Toshiba Corporation's 2009 Financial Review noted that the Toshiba Group comprised Toshiba Corporation and various "Consolidated Subsidiaries" that operate in its multiple business segments.

51.     Co-conspirators Toshiba Corporation and TAIS, which now includes the merged TACP, are referred to individually and collectively herein as "Toshiba."  All of the entities referred to as Toshiba participated in the collusive conduct described herein, either directly or as represented by other members of the Toshiba entities.

52.     Co-conspirator Samsung Electronics Co., Ltd. ("Samsung Electronics") is a business entity organized under the laws of South Korea, with its principal place of business at 1320-10, Seocho 2-Dong, Seocho-Gu, Seoul, 137-857, South Korea.  Samsung Electronics controls an integrated global enterprise comprising itself and other entities, including Toshiba Samsung Storage Technology Corporation and Toshiba Samsung Storage Technology Corporation Korea.  During the Conspiracy Period, Samsung Electronics manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United State.

53.     Co-conspirator Samsung Electronics America, Inc. ("SEA") is a subsidiary of Samsung Electronics, with its principal place of business at 85 Challenger Road, Ridgefield Park, New Jersey, 07660.  During the Conspiracy Period, SEA manufactured, sold, and/or distributed ODDs throughout the United States and imported ODDs into the United States.

54.     Samsung Electronics's 2008 Annual Report contains an organization chart depicting the tight control that Samsung Electronics exercises over its various business segments, with the "Digital Media & Communications Business" reporting directly to Samsung Electronics's CEO.  Samsung Electronics touts its "board-centered corporate governance

system" that ensures "accountability in management"; "the board actively supports top management in effectively managing the company to maximize corporate value." Samsung Electronics runs a "Samsung Advanced Institute of Technology"—the "global hub of our R&D business." The independent auditor's report incorporated in the Annual Report refers to Samsung Electronics and its "controlled subsidiaries" as "the Company." SEA is among them.

55.     Co-conspirators Samsung Electronics and SEA are referred to individually and collectively herein as "Samsung." All of the entities referred to as Samsung participated in the collusive conduct described herein, either directly or as represented by other members of the Samsung entities.

56.     Co-conspirator Toshiba Samsung Storage Technology Corporation is a business entity organized under the laws of Japan, with its principal place of business located at 1-1, Shibaura 1- chome, Minato-ku, Tokyo, 105-8001, Japan—the same address as that of Toshiba Corporation. Toshiba Samsung Storage Technology Corporation was formed in 2004 as a joint venture between Toshiba and Samsung, in which Toshiba has a 51 percent ownership interest and Samsung has a 49 percent ownership interest. During the Conspiracy Period, Toshiba Samsung Storage Technology Corporation manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

57.     Co-conspirator Toshiba Samsung Storage Technology Corporation Korea ("TSST Korea") is a business entity organized under the laws of South Korea, with its principal place of business located at 14th Floor, Building No. 102, Digital Empire 2, 486, Sin-dong, Yeongtong-gu, Suwonsi, Gyonggi-do, 443-734, South Korea, which is part of the Samsung Digital Complex. In its 2009 Annual Report, Toshiba lists TSST Korea as an overseas subsidiary. During the Conspiracy Period, TSST Korea manufactured, sold, and/or distributed ODDs throughout the

United States and directly caused ODDs to be imported into the United States.  TSST Korea's website notes that it operates through the "common relevant organization for mutual consent. We are currently responsible for the product development, marketing and sales, and have been taking advantage of the existing network of Samsung Electronics and Toshiba for manufacturing, sales and after-sales service."  The website notes further that "TSST is the result of close cooperation between Samsung Electronics and Toshiba."

58.     Co-conspirators Toshiba Samsung Storage Technology Corporation and TSST Korea are referred to individually and collectively herein as "TSST."  TSST has operated or currently operates sales offices in North America and logistics centers in Miami, Florida and San Diego, California.  All of the entities referred to as TSST participated in the collusive conduct described herein, either directly or as represented by other members of the TSST entities.

59.     Co-conspirator Sony Corporation is a business entity organized under the laws of Japan, with its principal place of business located at 7-1, Konan 1-chome, Minato-ku, Tokyo, 108-0075, Japan.  Sony Corporation controls an integrated global enterprise comprising itself and other entities, including Sony Electronics, Inc. and the Sony Optiarc entities described herein.  During the Conspiracy Period, Sony manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

60.     Co-conspirator Sony Electronics, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 16530 Via Esprillo, San Diego, California, 92127.  Sony Electronics, Inc. is a wholly-owned subsidiary of Sony Corporation of America, which is in turn a wholly-owned subsidiary of Sony Corporation.  During the Conspiracy Period, Sony Electronics, Inc. manufactured, sold, and/or distributed ODDs throughout the United States and imported ODDs into the United States.

61.     Co-conspirator NEC Corporation ("NEC") is a business entity organized under the laws of Japan, with its principal place of business located at 7-1, Shiba 5-chome, Minato-ku, Tokyo, 108-8001, Japan.  During the Conspiracy Period, NEC manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

62.     Co-conspirator Sony Optiarc Inc. is a business entity organized under the laws of Japan, with its headquarters at 4-16-1 Okata, Atsugi-shi, Kanagawa, 243-0021, Japan.  During the Conspiracy Period, Sony Optiarc Inc. manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States. Sony Optiarc Inc. is now part of Sony Corporation's Consumer Products & Devices Group and is headed by Shinichi Yamamura, who formerly ran Sony NEC Optiarc Inc.

63.     Co-conspirator Sony NEC Optiarc Inc. ("Sony NEC") was a business entity organized under the laws of Japan, with its headquarters at 4-16-1 Okata, Atsugi-shi, Kanagawa, 243-0021, Japan.  Sony NEC was formed on April 3, 2006 as a joint venture between Sony Corporation and NEC, in which Sony Corporation had a 55 percent ownership interest and NEC had a 45 percent ownership interest.  These percentages were based on the present value of future cash flows each joint venturer would receive from the joint venture, including cash flows obtained through the conspiracy described herein.  Sony Corporation designated the President of the joint venture, and NEC designated the Vice President of the joint venture.  Shinichi Yamamura, who was Deputy President of Video Business Group of Sony Corporation, became President of the new joint venture.

64.     On September 11, 2008, Sony Corporation acquired NEC's interest in Sony NEC and renamed it Sony Optiarc Inc.  During a portion of the Conspiracy Period, Sony NEC

manufactured, sold, and/or distributed ODDs throughout the United States and directly caused

ODDs to be imported into the United States.  The press release announcing Sony Corporation's

purchase of NEC's interest in Sony NEC said that "[a]s a result of this agreement, Sony will

make Sony NEC Optiarc Inc. a wholly owned subsidiary of the Sony group"; that Shinichi

Yamamura, Deputy President of the Video Business Group of Sony Corporation, would serve as

Sony Optiarc Inc.'s "Representative Director and President"; and that other directors were

"[s]cheduled to be elected from within the Sony group."

65.     Co-conspirator Sony Optiarc America Inc. is a wholly-owned subsidiary of Sony

Optiarc Inc.  Sony Optiarc America Inc. is a corporation organized under the laws of the State of

Delaware, with its principal place of business at 1730 North First Street, San Jose, California,

95112.  Sony Optiarc America Inc. was originally established as a joint venture between Sony

Corporation and NEC in April 2006, before Sony Corporation announced that it would take over

NEC's 45-percent share.  During a portion of the Conspiracy Period, Sony Optiarc America Inc.

manufactured, sold, and/or distributed ODDs throughout the United States and imported ODDs

into the United States.

66.     According to Sony Corporation's Form 20-F for the year ending March 31, 2011,

Sony Corporation is divided into business segments, including Consumer Products & Devices,

Networked Products & Services, and B2B and Disc Manufacturing.  The former two segments

contain ODDs.  The Form 20-F states that "[i]n most cases, sales of Sony's electronics products

are made to sales subsidiaries of Sony Corporation located in or responsible for sales in the

countries and territories where Sony's products and services are marketed.  These subsidiaries

then sell those products to unaffiliated local distributors and dealers or through direct sales via

the Internet.  In some regions, sales of certain products and services are made directly to local

distributors by Sony Corporation."  As the Form 20-F further explains, "Sony markets its electronics products and services through Sony Electronics Inc. and other wholly owned subsidiaries in the U.S."  The independent accounting report incorporated in the Form 20-F refers to Sony Corporation and its consolidated subsidiaries as "Sony."

67.     Upon information and belief, a former employee of Sony Optiarc Inc. has asserted that both Sony Optiarc Inc. and Sony Electronics, Inc. are "controlled by Sony Corporation."

68.     Co-conspirators Sony NEC, Sony Optiarc Inc., and Sony Optiarc America Inc. are referred to individually and collectively herein as "Sony Optiarc."  All of the entities referred to as Sony Optiarc participated in the collusive conduct described herein, either directly or as represented by other members of the Sony Optiarc group of co-conspirators.

69.     Co-conspirators Sony Corporation, Sony Electronics, Inc., Sony NEC, Sony Optiarc Inc., and Sony Optiarc America Inc. are referred to individually and collectively herein as "Sony."  All of the entities referred to as Sony participated in the collusive conduct described herein, either directly or as represented by other members of the Sony group of co-conspirators.

70.     Co-conspirator Panasonic Corporation is a business entity organized under the laws of Japan, with its principal place of business at 1006 Oaza Kadoma, Kadoma, Osaka, 571-8501, Japan.  Until October 1, 2008, Panasonic Corporation was known as Matsushita Electric Industrial Co., Ltd.  Panasonic Corporation controls an integrated global enterprise comprising itself and other entities, including Panasonic Corporation of North America.  During the Conspiracy Period, Panasonic Corporation manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

71.     Co-conspirator Panasonic Corporation of North America, formerly known as Matsushita Electric Corporation of America, is a corporation organized under the laws of the

State of Delaware, with its principal place of business at 1 Panasonic Way, Secaucus, New

Jersey, 07094.  Panasonic Corporation of North America is a wholly-owned subsidiary of

Panasonic Corporation.  During the Conspiracy Period, Panasonic Corporation of North America

manufactured, sold, and/or distributed ODDs throughout the United States and imported ODDs

into the United States.

72.     Co-conspirators Panasonic Corporation and Panasonic Corporation of North

America are referred to individually and collectively herein as "Panasonic."  All of the entities

referred to as Panasonic participated in the collusive conduct described herein, either directly or

as represented by other members of the Panasonic entities.

73.     Co-conspirator TEAC Corporation is a business entity organized under the laws

of Japan, with its principal place of business at 1-47 Ochiai, Tama-shi, Tokyo, 206-8530, Japan.

TEAC Corporation controls an integrated global enterprise comprising itself and other entities,

including TEAC America, Inc.  During the Conspiracy Period, TEAC Corporation

manufactured, sold, and/or distributed ODDs throughout the United States and directly caused

ODDs to be imported into the United States.

74.     Co-conspirator TEAC America, Inc. is a corporation organized under the laws of

the State of California, with its principal place of business at 7733 Telegraph Road, Montebello,

California, 90640.  TEAC America, Inc. is a wholly-owned subsidiary of TEAC Corporation.

During the Conspiracy Period, TEAC America, Inc. manufactured, sold, and/or distributed

ODDs throughout the United States and imported ODDs into the United States.

75.     Co-conspirators TEAC Corporation and TEAC America, Inc. are referred to

individually and collectively herein as "TEAC."  All of the entities referred to as TEAC

participated in the collusive conduct described herein, either directly or as represented by other members of the TEAC entities.

76.     Co-conspirator Quanta Storage, Inc. is a business entity organized under the laws of Taiwan, with its principal place of business at 3F, No. 188, Wenhua, 2nd Road, Guishan Shiang, Taoyuan County, 333, Taiwan, R.O.C.  Quanta Storage, Inc. controls an integrated global enterprise comprising itself and other entities, including Quanta Storage America, Inc. During the Conspiracy Period, Quanta Storage, Inc. manufactured, sold, and/or distributed ODDs throughout the United States and directly caused ODDs to be imported into the United States.

77.     Co-conspirator Quanta Storage America, Inc. ("Quanta America") is a corporation organized under the laws of the State of California, with its principal place of business at 2726 Bayview Drive, Fremont, California, 94538.  Quanta America is a wholly-owned subsidiary of Quanta Storage, Inc.  During the Conspiracy Period, Quanta America manufactured, sold, and/or distributed ODDs throughout the United States and imported ODDs into the United States.

78.     Co-conspirators Quanta Storage, Inc. and Quanta America are referred to individually and collectively herein as "Quanta."  All of the entities referred to as Quanta participated in the collusive conduct described herein, either directly or as represented by other members of the Quanta entities.

79.     HP's investigation into the identities of co-conspirators is ongoing.  HP reserves the right to identify additional co-conspirators in discovery and expert reports in this action. Upon information and belief, other partnerships, corporations, or business entities are co-conspirators of Defendants in their unlawful restraint of trade.

80.     In this Complaint, when reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## INTERSTATE AND IMPORT TRADE AND COMMERCE

81.     During the Conspiracy Period, Defendants and their co-conspirators collectively controlled a majority of the market for ODDs, globally, in the United States, and within this judicial district.

82.     During the Conspiracy Period, each Defendant and co-conspirator, or one or more of its subsidiaries and/or affiliated joint ventures, sold ODDs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

83.     During the Conspiracy Period, Defendants and their co-conspirators collectively imported millions of ODDs into the United States.

84.     Activities of Defendants and their co-conspirators, including marketing and sale of ODDs, have taken place in the United States; have been intended to have and have had a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate trade and commerce in the United States and upon import commerce with foreign nations; and has caused antitrust injury in the United States.

85.     Defendants' and their co-conspirators' conspiracy and conduct described herein have directly and substantially affected interstate commerce in that Defendants and their co-conspirators have deprived HP of the benefits of free and open competition in the purchase of ODDs in the United States.

86.     Defendants and their co-conspirators sell their ODDs through various direct channels, including to manufacturers of electronic products and devices, such as HP.

### FACTUAL ALLEGATIONS UNDERLYING DEFENDANTS' CONSPIRACY

## ODD TECHNOLOGY

87.     Optical discs contain microscopic pits where data are stored.  These pits are made from a crystalline metal alloy and are usually pressed into the disc in a spiral arrangement, starting at the center of the disc.  Once a disc containing information is inserted into the ODD, the disc spins while a lens inside the device guides a semiconductor laser beam over the disc and a photodiode detects the light reflected from the disc's bumps and pits.  The laser moves outward from the center of the disc, scanning over the disc's surface.  Then the photodiode reads the light's reflection as a binary code—a series of ones and zeros—that the computer translates into usable data.  Changes in the intensity of the beams as the lasers hit the pits are detected and translated into electrical signals.  The more pits that can be packed onto the disc, the more data the disc can store.  Reading the different disc formats requires the ODD to have lasers of different wavelengths.  Blu-ray disc ("BD") players use a shorter wavelength laser, which is blue-violet, to read discs.  Additional layers can be added to the disc as well, increasing storage capacity.  In addition to reading discs, ODDs can write and rewrite on the disc, depending on the technology of the drive and accompanying disc.

88.     When a recordable disc is inserted into an ODD that has the ability to record data, the ODD's laser is used to heat selectively parts of the organic photosensitive dye layer.  By exposing the disc to light with the laser, the reflective properties of the disc's surface change, which causes the photodiode to recognize these changes as bumps and pits and read the new information on the disc.

89.    ODDs include half-height ("HH"), slim, and ultraslim models.  HH ODDs are thicker and generally incorporated into desktop computer towers.  Slim and ultraslim ODDs are thinner and generally incorporated into laptop computers.  As laptop computers have become more popular with consumers, demand for slim and ultraslim ODDs has increased.

90.    The back end of the ODD typically contains a port for a cable that connects to the motherboard and a connection for power from the power supply.  ODDs connect to the motherboard of a computer through either a Serial Advanced Technology Attachment ("SATA") or Parallel Advanced Technology Attachment ("PATA") interface.  Where the ODD is intended for external use with a computer, it is connected to the computer through some type of interface, such as a Universal Serial Bus ("USB") connection.

## EVOLUTION OF ODDS AND SALES

91.    The optical disc was invented in 1958.  In 1961 and 1969, patents were registered for the analog optical disc for video recording.  In 1969, Royal Philips began its first optical videodisc experiments.  The first ODD was invented with the creation of the audio compact disc ("CD"), which was jointly invented by Sony and Royal Philips and intended to store analog video signals and music and computer software.  In 1972, Royal Philips announced a technique for storing audio recordings on an optical disc with a small diameter.  At the same time, Sony was exploring optically recording audio on a larger disc, but was focusing on developing an error correction technique.  In 1978, Sony and Royal Philips agreed on a single format for the disc and the error correction method that would be used.  The CD system was introduced to the public in Japan and Europe in 1982.  Since the 1980s, several companies have created spin-offs of the CD project by covering specific CD-based applications and extending the previously established standards that Sony and Royal Philips set.

92.     The first generation of ODDs utilized CDs that could store 650 megabytes ("MB") of data, but for several years, the CDs were available only in a read-only format ("CD-ROM").  Once the standard of how to create a CD and an optical device that reads the information on the CD was established, CD-ROM drives began to penetrate the computer market.  ODDs have been in common use in computers since the 1990s, when CD-ROM drives became affordable for the average consumer.  Both HLDS and TSST stopped making CD-ROM drives and CD-RW drives at the beginning of 2008.

93.     In the mid-1990s, a consortium of manufacturers, including Hitachi, Pioneer, Royal Philips, Sony, and Toshiba, developed the second generation of the optical disc, the digital versatile disc ("DVD").  The second generation of drives used DVDs that could store 4.7 gigabytes, but DVDs were more quickly available in both a read-only format and a format that allowed both reading and recording.  The DVD was intended to store great amounts of data, including broadcast-quality digital video.  ODDs using DVDs are currently the most prevalent in both consumer electronics products and computers.

94.     The third generation of ODDs uses BDs that can store in excess of 20 gigabytes and also have both read-only and read/record formats.  Toshiba developed and promoted a high definition DVD ("HD-DVD") format for third generation ODDs.  In June 2008, however, it announced that it would no longer develop or manufacture ODDs using HD-DVDs and would instead use the BD format developed and promoted by Sony.  In 2006, the specifications for the third generation optical disc, the BD format, were finalized.  The Blu-ray standard was developed by the Blu-ray Disc Association, an industry group which included makers of consumer electronics, computer hardware, and motion pictures.  The Blu-ray format was designed to supersede the DVD format and dramatically improve on the quality and capacity of

the DVD.  The BD was meant to be able to distribute high-definition video and support greater data storage capacity than the DVD.  Afterwards, manufacturers began to develop ODDs for computers that could read and write both DVDs and BDs.

95.     The latest ODDs, which can read from and write and rewrite onto all kinds of optical discs and are thus fully backward compatible, are known as "super multi-drives."

96.     Throughout its history, but especially after 2000, the ODD market, which requires significant technical resources and advanced manufacturing capabilities, has been dominated by a small group of manufacturers, as discussed in greater detail below.

97.     The ODD market has also consistently been faced with downward pricing pressures, including those resulting from the technological advances in ODD technology described above.  As Defendants and their co-conspirators improved their ability to manufacture ODDs more efficiently and at a lower cost, the price of this technology began to decline.  To arrest this competitive dynamic, Defendants and their co-conspirators colluded to fix and stabilize prices and to allocate markets or customers.

98.     During the Conspiracy Period, ODDs were a standard component on computers in the United States.  Due to the increasing popularity of personal computers during the Conspiracy Period, Defendants and their co-conspirators shipped hundreds of millions of ODDs each year, generating billions of dollars in annual revenues.  According to an analysis by IDC, an industry data source, between 2004 and 2008, worldwide ODD shipments generated more than $45 billion in revenues.

99.     Defendants and their co-conspirators have remained market leaders because of their collusive conduct.  Although the market for CDs has decreased, the market for DVDs and BDs has grown exponentially as consumers have shifted to the new formats.

**STRUCTURAL MARKET FACTORS FAVORING COLLUSION**

100.    During the Conspiracy Period, the ODD market exhibited several factors that contributed to the ability of Defendants and their co-conspirators to carry out their conspiracy, including, but not limited to, market concentration; joint venture or other collaborations; significant barriers to entry, including patent pools; common trade associations and business organizations; and the standardization of ODDs.

101.    *Market Concentration*—The ODD market is highly concentrated and dominated by a small group of suppliers.  This concentrated market is conducive to and facilitates the collusive conduct alleged herein.  Upon information and belief, TSST, Sony Optiarc, HLDS, PLDS/PBDS, and other Defendants and co-conspirators controlled more than 90 percent of the market.

102.    *Joint Venture or Other Collaborations*—The ODD industry has experienced significant consolidation.  As manufacturing migrated toward lower-cost drive makers in Korea and Taiwan between 2001 and 2003, early Japanese manufacturers still held key competitive advantages in the form of intellectual property rights.  To mitigate the high cost of royalty payments for licensing this intellectual property, Korean and Taiwanese Defendants partnered with the patent holders through strategic alliances and joint ventures.  These alliances include:

a.    HLDS, Inc., a joint venture formed in November 2000 in Tokyo, Japan that began operations in January 2001;

b.    JVC Lite-On IT Manufacturing & Sales Ltd., a production and marketing company founded in October 2001 in Hong Kong;

c.    PBDS, a joint venture founded in February 2003 and specializing in the manufacture of DVD+RW ODDs;

      d.      The Sony & Lite-On "Alliance," a memorandum of understanding signed in May 2003 that led to acts of price-fixing of ODDs;

      e.      TSST, a joint venture established in April 2004;

      f.      Sony NEC, a joint venture between Sony and NEC formed in 2006, followed by NEC's transfer of its stock in the joint venture to Sony in September 2008;

      g.      Lite-On's acquisition of BenQ's ODD production facilities in 2006;

      h.      Philips & Lite-On Digital Solutions Corporation, a joint venture formed in March 2007; and

      i.      PDDMC, a joint venture announced in June 2009 and finalized in November 2009.

103.     The mutually beneficial nature of the business relations between and among certain Defendants and co-conspirators provided the opportunity for their parent entities to conspire and created a financial incentive to do so.  As Gerald Cavanagh, a Sony spokesman in Tokyo, explained when announcing the formation of Sony NEC, the joint venture was formed because "[t]here was a feeling that those two complementary strengths [of Sony and NEC] would make more sense in a joint venture than competing against each other."

104.     Similarly, upon information and belief, after the formation of PLDS, the company's general manager, Tseng Huan-Xiong, stated that "[Royal] Philips and Lite-On in the future will target at making profits and avoid price wars."  "While aiming for large shipment volumes, PLDS will maintain steady profits and therefore will maintain a minimum gross margin by refusing low-priced orders as well as not participating in price-cutting competition, Tseng pointed out."

105.    In addition, at various points during the Conspiracy Period, one Defendant or co-conspirator produced ODDs for another Defendant or co-conspirator.  For example, upon information and belief, in November 2004, it was reported that Lite-On would produce more non-Blu-ray ODDs for Sony.  As another example, in 2000, TEAC entered into an ODD co-development arrangement with Royal Philips.  As a third example, Quanta has manufactured ODDs for PLDS/PBDS and Sony Optiarc.

106.    These joint ventures and collaborations among Defendants and their co-conspirators enabled them to force out most of Taiwan's second-tier manufacturers and almost all Chinese manufacturers from the ODD industry. This latter result was anticompetitive because the Chinese manufacturers had lower labor costs, a market reality that normally would enable a manufacturer to drive down prices on products such as ODDs.

107.    *Barriers to Entry*—The market for the manufacture and sale of ODDs was subject to high manufacturing and technological barriers to entry during the Conspiracy Period. Efficient manufacturing plants are large and costly.  Companies, such as Defendants and their co-conspirators, which develop and manufacture ODDs face technological advances, causing the companies to undertake significant research and development expenses.

108.    Additionally, Defendants and their co-conspirators belong to or control patent pools that effectively deter entry into the ODD market by imposing high licensing costs on required technology.  These pools include the 3C DVD Patent Group, exploiting patents related to the DVD format; the similar DVD 6C Patent Pool; the DB4C Licensing Group, covering the Blu-ray format; and several patent pools relating to CD technology.

109.    The history of the patent pool for CD-R technology illustrates how patent pools can be used for anticompetitive collusion.  To facilitate patent licensing to CD-R producers

around the world, Royal Philips, Sony, and Taiyo-Yuden adopted a joint licensing arrangement whereby Sony and Taiyo-Yuden first licensed their patent rights to Royal Philips, and then Royal Philips bundled the rights together for licensing to other companies.  In a decision entered in December 2008, the Taiwan Fair Trade Commission (the "TFTC") concluded that these companies engaged in unlawful "concerted action," improperly excluded competitors from the market, and overcharged patent licensees.  As stated on the TFTC's website:

> After considering the unlawful acts' impact on the functioning of market mechanisms of the technology patent licensing markets and associated products at issue, as well as the respondents' motives for the violation, benefits obtained thereby, and considerable business scales and prominent market standing, the [T]FTC imposed administrative fines of NT$ 8 million on Philips, NT$ 4 million on Sony, and NT$ 2 million on Taiyo Yuden, and ordered the companies to immediately cease the illegal practices pursuant to the fore part of Article 41 of the [Taiwanese Fair Trade Law].

110.    Because of the barrier to entry caused by onerous patent royalties, efficient Korean and Taiwanese manufacturers that could not otherwise thrive in the ODD market formed joint ventures with less efficient manufacturers holding intellectual property rights.  The ODD market thus increasingly coalesced around an oligopoly consisting of TSST, Sony NEC (later Sony Optiarc), HLDS, and PBDS (later PLDS).  Upon information and belief, an analyst report in 2003 noted that "the collective market share of this group will swell further to about 80% – 90% over the next two years."  That is what happened during the Conspiracy Period, and the conspiracy has controlled prices for ODDs.

111.    ***Trade Associations and Business Organizations***—Various industry trade associations and organizations facilitated Defendants' and their co-conspirators' price-fixing of ODDs.  These industry groups held numerous meetings and events during the Conspiracy Period.  Defendants and their co-conspirators participated in many of these trade association meetings

and events, which provided a forum for Defendants and their co-conspirators to discuss and exchange information on pricing and production of ODDs; to communicate and agree upon the prices for ODDs; and to carry out their conspiracy, with the purpose and effect of raising, fixing, and stabilizing prices of ODDs; bid-rigging; and market allocation.  In several instances, trade association meetings and events preceded examples of collusive pricing conduct described below.  Examples of the trade associations include:

        a.   <u>CD Trade Associations</u>:  CDs21, including HLDS, Lite-On, Royal Philips Japan Co., Ltd., Sony, and TSST.

        b.   <u>DVD Trade Associations</u>:  DVD Forum, including Hitachi, LG, Lite-On, NEC, Pioneer, Quanta, Royal Philips, Samsung, Sony, TEAC, and Toshiba; Recordable DVD Council, including Hitachi, Samsung, and Toshiba; RAM Promotion Group, including HLDS, LG, Samsung, TEAC, and Toshiba; and DVD+RW Alliance, including Royal Philips and Sony.

        c.   <u>Multi-Format Trade Associations</u>:  Optical Storage Technology Association ("OSTA"), including LG, Philips Electronics, Pioneer, Samsung, Sony, and Toshiba; International Symposium of Optical Memory, including Hitachi, LG, NEC, Samsung, Sharp, Sony, and Toshiba; and RW Products Promotion Initiative, including LG, Lite-On, NEC, Pioneer, Samsung, Sharp, Sony, Sony Optiarc, and TSST.

112.    The International Consumer Electronics Show ("CES"), the largest consumer electronics show in the world, was held annually during the Conspiracy Period.

113.    The Optical Storage Symposium is a worldwide conference held annually during the period from 2001 to 2007 at various locations and sponsored by OSTA.  In 2005, this event

was held in Burlingame, California on September 28, 2005, co-sponsored by, among others, Sony and Toshiba, and included presenters from Sony and Toshiba.  In 2006, the event was held in Tokyo, Japan on October 5, 2006 and included presenters from Sony, Hitachi, and CDs21.  In 2007, this event was held in South San Francisco, California on September 19, 2007.

114.    The Internationale Funkausstellung (the "IFA") is a worldwide exhibition of consumer electronics products held annually in Berlin, Germany and attended by representatives of Defendants.  Recent IFA shows occurred on September 2 to 7, 2005; September 1 to 6, 2006; August 31 to September 5, 2007; August 29 to September 3, 2008; September 4 to 9, 2009; and September 3 to 8, 2010.

115.    The conduct of the "business" of these organizations or events gave Defendants and their co-conspirators the cover needed to contact one another to communicate competitive information and reach and/or implement anticompetitive agreements.

116.    *Standardization of ODDs*—A product is considered standard across suppliers when there is a high degree of substitutability among different suppliers in the market.  When products are viewed as interchangeable by purchasers, it is easier to agree on a single price for the good in question and to effectively monitor those prices.  Standardization makes it easier to form and sustain a conspiracy.  As part of the conspiracy, Defendants and their co-conspirators standardized products in the ODD market.

117.    The ODD market has been typified by standardization of ODDs driven by market participants and a variety of industry-related organizations such as ECMA International, the International Organization for Standardization (the "ISO"), and the International Electrotechnical Commission.  These organizations and their members are dedicated to "standardizing the use of information and communication technology and consumer electronics."

118.    As noted above, the ODD market is also subject to patents and intellectual property rights, which are utilized to require adoption of standardized product specifications.

119.    The standardization of the ODD market provided Defendants and their co-conspirators with the mechanism to implement, enforce, and oversee their agreements to stabilize the prices of ODDs.  As a result of this standardization, ODDs are commodity products, and buyers make decisions to purchase such products based largely on price.  As one market analyst noted in a treatise on optical and magnetic storage, upon information and belief, "[a]s with DRAM chips, the market for magnetic and optical drives is a commodity one; brand name matters little if at all. . . . Optical drives are provided by consumer appliance companies, mostly Japanese, Korean and Taiwanese."  Likewise, upon information and belief, Kris Williams of NEC, in a 2006 e-mail, referred to "commodity products like DVD-ROM and CD-RW."

**DEFENDANTS' ACTS OF COLLUSION**

120.    Defendants and their co-conspirators reached agreements, the object of which was to stabilize the prices for ODDs in numerous ways throughout the Conspiracy Period.

121.    Defendants and their co-conspirators participated in meetings, discussions, and communications in the United States or elsewhere to discuss bidding strategies and prices of ODDs.  During those meetings, discussions, and communications, Defendants and their co-conspirators reached agreements regarding prices to charge customers for ODDs and how participants would bid on ODDs, including prices and bids to HP.  Defendants and their co-conspirators submitted bids and prices in accordance with the agreements reached during those meetings, discussions, and communications.

122.    In November 2011, HLDS, Inc. pled guilty to conspiring to fix prices and rig bids for ODDs sold to HP, Dell, and Microsoft. In its guilty plea agreement, HLDS, Inc. agreed to

pay $21.1 million in criminal fines.  HLDS, Inc. admitted that this conspiracy was carried out, in part, in California.  HLDS, Inc. further admitted that its officers and employees engaged in discussions and meetings with representatives of other major sellers of ODDs.  During these discussions and meetings, HLDS, Inc. reached agreements to fix prices of ODDs and to rig ODD online Internet negotiations.  HLDS, Inc. specifically admitted to conspiring to rig bids for HP ODD online Internet negotiations in November 2005, August 2006, August 2007, May 2008, July 2008, August 2008, October 2008, November 2008, and February 2009.

123.    The criminal information that the DOJ filed against HLDS, Inc. charged that HLDS, Inc. rigged bids for CD-ROM, CD-RW, DVD-ROM, and Combo drives for HP from approximately November 2005 to approximately April 2006.  At least HLDS, PLDS, TEAC, and TSST supplied HP with ODDs around the time the bids were rigged.

124.    The criminal information that the DOJ filed against HLDS, Inc. charged that HLDS, Inc. rigged bids for half-height PATA and SATA DVD-ROM drives for HP from approximately August 2006 to approximately December 2006.  At least HLDS, PLDS, TEAC, and TSST supplied HP with ODDs around the time the bids were rigged.

125.    The criminal information that the DOJ filed against HLDS, Inc. charged that HLDS, Inc. rigged bids for Lightscribe DVD-RW drives for HP from approximately August 2007 to approximately December 2007.  At least HLDS, PLDS, TEAC, and TSST supplied HP with ODDs around the time the bids were rigged.

126.    The criminal information that the DOJ filed against HLDS, Inc. charged that HLDS, Inc. rigged bids for half-height SATA DVD-RW drives for HP from approximately May 2008 to approximately June 2009.  At least HLDS, Panasonic, Pioneer, PLDS, Sony Optiarc, TEAC, and TSST supplied HP with ODDs around the time the bids were rigged.

127.     The criminal information that the DOJ filed against HLDS, Inc. charged that HLDS, Inc. rigged bids for 12.7mm SATA DVD-RW drives for HP from approximately July 2008 to approximately March 2009.  At least HLDS, Panasonic, Pioneer, PLDS, Sony Optiarc, TEAC, and TSST supplied HP with ODDs around the time the bids were rigged.

128.     Additionally, the following HLDS executives individually pled guilty to participating in the conspiracy: Young Keun Park; Sang Hun Kim; Sik Hur, also known as Daniel Hur; and Woo Jin Yang, also known as Eugene Yang.  Each of the executives was ordered to pay a $25,000 criminal fine and also received a jail sentence.

129.     According to the criminal information that the DOJ filed against him, Young Keun Park was the HLDS executive responsible for HLDS's HP account during the period from approximately November 2005 to approximately March 2009.

130.     According to the criminal information that the DOJ filed against him, Sang Hun Kim was a Team Leader in charge of HLDS's HP account in 2005, in 2006, and from 2008 to September 2009.  In January 2009, he became the Deputy Chief Marketing Officer of HLDS.

131.     According to the criminal information that the DOJ filed against him, Sik Hur, also known as Daniel Hur, was an Account Manager responsible for HLDS's HP account from November 2005 to May 2006; a Team Member for HLDS's HP account from May 2006 to December 2006; the Team Leader for HLDS's HP account from January 2007 to December 2007; and the Account Leader in charge of HLDS's HP account from January 2008 to June 2009.

132.     According to the criminal information that the DOJ filed against him, Woo Jin Yang, also known as Eugene Yang, was an Account Manager responsible for HLDS's HP account during the period from approximately August 2006 to approximately March 2009.

133.     Pursuant to their price-fixing conspiracy, Defendants and their co-conspirators exchanged confidential business information concerning ODDs, prices charged and to be charged for ODDs, production capacity with respect to ODDs, business plans for ODDs, plans for the introduction of new ODDs, confidential roadmaps for product rollouts and production, confidential product quality information, confidential product inventory and shipping information, company responses to customer initiatives, and plans for the cessation of manufacture of ODDs that had reached the ends of their respective lifecycles.

134.     Upon information and belief and review of the pleadings in *In re Optical Disk Drive Products Antitrust Litigation*, Case No. 10-md-02143 (N.D. Cal.), to date, certain Defendants and their co-conspirators have already produced more than 4 million documents that contain information regarding Defendants' and their co-conspirators' confidential information exchanges and agreements.

135.     The patent pools described above also facilitated the operations of the price-fixing conspiracy.  They restricted competition among pool members and, as reflected in the CD-R patent pool involving Royal Philips, Sony, and Taiyo-Yuden described above, operated as a vehicle to unlawfully fix prices.  For example, upon information and belief, licensees from the 3C DVD Patent Group and DVD 6C Patent Pool had to report customer, sales, and pricing data to those pools, thus ensuring that the co-conspirators who operated them can have access to sensitive non-public commercial information that facilitated the conspiracy.  In fact, the license agreement for the DVD 6C Patent Pool specifically required the patent licensee to agree that such information could be shared among the members of the licensing group.

136.     The following paragraphs reflect representative actions of Defendants and their co-conspirators in engaging in a price-fixing conspiracy, including exchanging pricing, supply,

capacity, quality, and bid positioning information with their competitors, and are presented upon information and belief.  These actions show an agreement to stabilize ODD prices and conduct that facilitated that price stabilization.

137.    Defendants and co-conspirators exchanged competitively sensitive information through e-mail communications, telephone calls, and face-to-face meetings.  The exchanges were directed by customer account managers and sales directors of Defendants and their co-conspirators.  These account managers and sales directors exchanged personal cell phone numbers and e-mail addresses with their rival ODD suppliers to facilitate the conspiracy, and the contacts were so important that employees, when switching jobs, would introduce their replacements to their contacts at rival ODD suppliers.

138.    During the Conspiracy Period, individuals who participated in one or more online Internet negotiations that HP conducted for the purchase of ODDs include, among others: Michael Chang, on behalf of Lite-On; Kenny Lee, on behalf of TSST; J.C. Lim, on behalf of PLDS; James Park, on behalf of HLDS; Beum Seock, on behalf of HLDS; Peggy Su, on behalf of PLDS; and Eugene Yang, on behalf of HLDS, who pled guilty to participating in conspiracies to suppress and eliminate competition by rigging ODD procurement events that HP hosted.  Upon information and belief, Eugene Yang is also known as Yang Woo and Yang Woo Jin.

139.    In a July 2005 e-mail, Hank Hayami of NEC reported to other NEC employees that "when our [(NEC's)] top management met TSST top management last week, TSST clearly mentioned as below."  The e-mail went on to discuss a number of sensitive issues regarding ODD products:

> 2)HP Slim
>
> TSST mentioned that Slim DVD w/LS for HP is going quite well.
> The current production rate is 50K/month, but HP requested TSST

to support 100-150K/month.  However, TSST feels that they
should very carefully monitor if LS media is really recognized by
end-users or not in maretability [sic].
The fork of the stepping motor for TSST LS slim drive is weak and
TSST needs an encoder in the feeder function.
The picture quality on LS media drawn by TSST drive is better
than HP's own reference samples and HP praised it.
TSST is prepared to support LLS and plan to isolate it from LS
development.

140.    In August 2005, Duha Hwang of LG e-mailed HLDS employees regarding an HP

ODD procurement event.  Mr. Hwang reported under the heading "Discussion with TSST":

**Discussed our proposal with HQ.  Agrees on the overall
approach but practically appears to want to avoid the situation
of being one of the two vendors who takes the hit when one
vendor enters the auction first and stays with current price
while other two vendors wait.** . . .  Planned to discuss next week
after more consideration, but I doubt if any bright conclusion will
come forth.

(Emphasis added.)

141.    A November 2005 e-mail from Sam Kim of HLDS to "HLDS Management,"

regarding an HP ODD procurement event, reported pricing coordination between HLDS and

Lite-On during the auction itself:

2. eAuction Price
- After about **one and half hour into the eAuction, LO called us
and suggested that either HLDS come in 1st and de-commit
volume so it is allocated to LO**, or have LO come in 1st so that
LO decommits and HLDS comes in 2nd and shares the volume.
LO said they would follow HLDS' opinion, so it was agreed to
have LO come in 1st and decommit.

(Emphasis added.)  Upon information and belief, the "LO" that Mr. Kim referred

to is Lite-On.

142.    A May 2006 e-mail from Eugene Yang of HLDS to Daniel Hur of HLDS

requested competitors' contact information.  In response, Mr. Hur acknowledged the illegal

nature of the competitor contacts and explained to Mr. Yang that he should meet his competitors

at "a place where it would be very unlikely for HP people to see you."  Mr. Hur's response reads:

> The PM for Lite-on is Michael Chang
> Michael_Chang@liteonit.com
> Cell phone number is 281-924-0629
> You may call Mr. Chang directly, saying you are my replacement.
> **When meeting and talking with Mr. Chang, you must choose a place where it would be very unlikely for HP people to see you**.
> During the day time, I would use Jones and Starbucks on 1960, but that does not meet [sic] those places are guaranteed to be safe.

(Emphasis added.)

143.    In July 2006, Daniel Hur of HLDS circulated a memorandum to "management

level" HLDS employees, including Young Keun Park (Chief Marketing Officer) and Sang Hun

Kim (Team Leader) requesting the development of a response to HP's use of online auction

procedures.  Included in the report was a "Current Status Review / Competitor & Us," along with

competitor information from TSST and Lite-On.  The information included:

> **TSST won't increase the price during the Auction period (Sep – Nov),** and it will supply 55% of proposed quantity at the Auction. . . .  And based on the acquired information, TSST is passive to increase the price from Dec to Feb after the Auction.

(Emphasis added.)  Mr. Hur further reported that Lite-On "won't take price-increase strategy, but

rather, it might act more aggressively to secure more quantity."

144.    In an August 2006 e-mail, Nancy Gray of LG reported to Eugene Yang of HLDS

regarding her "Lunch with Panasonic."  Ms. Gray reported that for certain ODD products:

> **Panasonic is okay with coming in 3rd place**.  As they still have a reserve of additional share, combined with the auction they still consider themselves in 2nd place behind HLDS.  They are okay with being behind HLDS, for now anyway, as they know they cannot beat our pricing.

(Emphasis added.) Mr. Yang forwarded Ms. Gray's e-mail to Young Keun Park of HLDS and Daniel Hur of HLDS, among others, explaining the e-mail and stating that Ms. Gray "has personal meeting with Amy about once a month because Nancy had working experience in Panasonic before." Mr. Yang then confirmed that he himself had "checked Panasonic's internal evaluation about Auction," presumably from his own sources. Mr. Hur responded with the request that Mr. Yang "kindly keep updating competition status" from Panasonic and Lite-On.

145. In a March 2007 e-mail, Amy Salter of Panasonic reported to Yoshihiro Takada of Panasonic and Steve Hamlin of Panasonic that she had met with Nancy Gray of HLDS and had exchanged further competitor information, including from both HLDS and Sony Optiarc:

I talked with Nancy yesterday regarding June RFQ.

HLDS has been given funding to quote below $32 for June. Nancy indicated they could go as low as $31.70. HLDS does not want to quote this low price but will have to do it if the other companies go below $32. Nancy had lunch with Phoebe (QSI/OPTIARC account manager). It looks like Optiarc can quote $31.50 in June. Optiarc strategy is get #1 price to show ability to Hp and build confidence. Optiarc is aware they may not get largest TAM but their point 1 H07 is show #1 price. Optiarc plans to push for more volume in 2H07 once they have Hp confidence in price and supply area.

Based on their discussions and Eugene insider information, HLDS believes the auction result could be as below.

HLDS June auction result prediction

1. Optiarc $31.50
2. TSST $31.60-31.70
3. HLDS $31.70 (HLDS could end of#3 or#4 position it depends on Pioneer ability)
4. Pioneer $31.70-31.80
5. Panasonic or PBDS at $32

Upon information and belief, the "Eugene" that Ms. Salter referred to is Eugene Yang of HLDS.

146.    In January 2008, Eugene Yang of HLDS reported to the HLDS "HP Account"
that although HLDS had been excluded from the upcoming HP ODD procurement event, HLDS
had disclosed this information to its competitors, PLDS and TSST, to persuade these competitors
not to lower their price:

> The RFQ for SATA DVD-ROM, which had been conducted for 2
> rounds, was completed yesterday this time.
>
> But both T* and P* didn't get any comments on ranking or
> volume, but received a proposal for a face-to-face negotiation on
> Wednesday.
>
> Houston office, although it may have some potential risks, has
> released to **T\* and P\* the information that HLDS would not be
> participating and the information on other competitors, and
> has persuaded them that they need not lower their price** since
> the 2 companies would gain major volume regardless of price.

(Emphasis added.) Upon information and belief, the "T*" that Mr. Yang referred to is TSST, and
the "P*" that Mr. Yang referred to is PLDS.

147.    In an October 2008 e-mail, Eugene Yang of HLDS proposed to HLDS employees
pricing for an upcoming HP ODD procurement event, based on "a thorough confirmation [of]
the current status of our competitors."  Mr. Yang then reported sensitive information regarding
HLDS's competitors, PLDS, Quanta, Sony NEC, and TSST, including the following details
regarding PLDS:

> It is targeting for 1st or 2nd place, and it is currently estimating a
> 30% Share acquisition as its Min level.
> It has not yet settled on a price standard and hopes that the price
> will be determined at a reasonable level, However, it is trying to
> secure more than 30% of the Shares even if it has to go through a
> second round of negotiations with Edward again.

Upon information and belief, the "Edward" that Mr. Yang referred to is Edward Yambao of HP, who was a Commodity Manager running HP's day-to-day procurement operations for ODDs at that time.

148.    In an October 2008 e-mail, Caroline Lin of Quanta e-mailed other Quanta employees regarding an "RFQ Discussio [sic] with Amino-san."  Upon information and belief, the e-mail subject referred to Amino Masafumi of Sony Optiarc.  Quanta and Sony Optiarc were to act as partners in an upcoming ODD procurement event.  Ms. Lin reported:

> I'll have dinner w/HLDS Eugene [Yang] this Friday evening and get the consensus on the price protection.

149.    The following Monday, Ms. Lin reported to her colleagues at Quanta, Sally Huang and Haw Chen:

> Last week, I met HLDS guy.  According to what he said, their best price is around 24.65 eventually.  However, the [sic] they won't go that far in the 1st round as well and might provide a higher price to see HP's feedback & then react.

150.    In February 2009, internal HLDS e-mails—involving, among others, James Park, Beum Seock, and Eugene Yang (also known as Yang Woo Jin)—again acknowledged that the competitor contacts were improper given government investigations in other industries, but then counseled employees to simply keep these contacts out of documents or e-mails:

> From: kimsanghun [kimsanghun@hlds.co.kr]
> Sent: Tuesday, February 17, 2009 9:43 AM
> To: Jason Kim; 'Kim Young Sam'; Yang Woo Jing; James Park
> Cc: Daniel Hur; Beum Seock; Min So Jung
> Subject RE:: Competitor contact
>
> Recently in the USA & EU, investigations on collusion between suppliers are being strengthened.  LG TV & LGD are under the investigation as a close example.  I guess other industries also know this thru news or something.  With competitor, especially T company, we need to be extremely careful about contacts, and **let's be careful so that there are not should in documents / email.**

> (since the share of T and us combined becomes more than 50%,
> there is a chance that the issue will grow even bigger).  Recently,
> HE President and CEO emphasized this again.

(Emphasis added.) Upon information and belief, the "T company" and "T" referred to in this e-mail is TSST.

151.   In a March 2009 e-mail, Daniel Hur of HLDS encouraged his colleagues—including, among others, Eugene Yang of HLDS—to further mask their competitive contacts:

> I would like to suggest using phones where only out-going calls
> can be made instead of our cell phones that we use for business
> purposes in order to avoid any unnecessary misunderstanding or
> misapprehension when gathering market intelligence.

152.   In or around March or April 2009, Yoshihiro Takada of Panasonic requested that Amy Salter of Panasonic collect "as much [information] as possible" from Panasonic's competitors.  Ms. Salter then gathered and relayed information from HLDS and TSST, among others.  In particular, Ms. Salter wrote:

> Eugene is not motivated to hurry price reductions or focus on next
> generation models.  HLDS has inventory and 12k deal with
> Edward last year was a complete failure so Eugene does not want
> to make any deals for price or quantity.

Ms. Salter further wrote:

> Based on SMD price trends, Kenny needs to stay $22 or higher
> through 2009.  Since Panasonic, Pioneer and PLDS are gone from
> SMD business, he does not believe he will have to be extremely
> aggressive to keep his share.  He seems confident TSST will have
> 45% share through 1.5C.  Due to price down requests, Kenny
> (TSST) hopes price reduction for SMD will take place again after
> 2C.  If Hp requires price reduction in 2C, it will be minor.

Upon information and belief, the "Eugene" that Ms. Salter referred to is Eugene Yang of HLDS, and the "Kenny" that Ms. Salter referred to is Kenny Lee of TSST.

153.     Additionally, upon information and belief, individuals who participated in one or more online Internet negotiations that HP conducted for the purchase of ODDs and who participated in competitor contacts during the Conspiracy Period include:  J.C. Lim of PLDS and Peggy Su of PLDS.

**GOVERNMENT ANTITRUST INVESTIGATIONS OF THE ODD INDUSTRY**

154.     In and after 2009, ODD manufacturers, including HLDS, Royal Philips, Sony, and Toshiba, acknowledged in public filings by themselves or their parents that they received DOJ subpoenas related to an antitrust investigation into the ODD industry or were the target of a DOJ investigation into the ODD industry.  According to media reports, an unnamed source said "the Justice Department started a criminal antitrust probe into the market for optical drives in recent months, investigating disk-drive makers for possible price-fixing, bid-rigging and allocation of markets."

155.     On October 27, 2009, the DOJ confirmed that "[t]he antitrust division is investigating the possibility of anticompetitive practices in the optical disc drive industry."

156.     On May 20, 2010, the DOJ confirmed its activities in a formal motion filed in judicial proceedings.  In that motion, the DOJ stated that it "is currently investigating possible criminal violations in the Optical Disk Drive ('ODD') industry."

157.     The DOJ's investigation has already yielded a guilty plea from HLDS, Inc. and four HLDS executives, as described above.

**ECONOMIC DATA ON PRICING AND SUPPLY**

158.     ODD pricing during the Conspiracy Period did not behave as would be expected in a competitive market.

159.     After introduction into a market, consumer electronics products and their component parts are typically characterized by downward pricing trends.  The ODD market, however, has been characterized by unnatural price stability and certain periods of upward pricing trends.

160.     The cost of manufacturing ODDs should have declined as industry consolidation and manufacturing bases shifted to lower-cost countries.  In a competitive market, this would be reflected in downward pricing trends as well.  However, prices for ODDs started to level off.

161.     As noted above, according to industry sources and statements by Defendants and their co-conspirators, firms increasingly attempted to stabilize pricing and avoid continued decreases in pricing and, presumably, profit margins.

162.     If they had acted independently, ODD makers would have had different incentives, depending on the size of their market share in an existing generation of optical disc technology.  The fact that Defendants and their co-conspirators uniformly held off on significant price reductions regardless of share demonstrates that they were acting conspiratorially.  Because of these different incentives, stable prices cannot be explained merely as conscious parallelism.

163.     As one news report, issued at the time of the announcement of the DOJ's investigation of Sony's ODD subsidiary, observed:

> Analysts have been wondering why Blu-ray prices have remained high even though the technology has been commercially available for over three years.  HD-DVD has been gone for nearly two-thirds of that time and one would have expected costs to have declined by now.  The fact that they haven't is causing some to question whether or not Sony is doing something to keep the prices up.

**HISTORY OF COLLUSION IN OTHER MARKETS**

164.     Many of Defendants and their co-conspirators have a long history of collusion; have been involved in antitrust investigations into other technology-related products; and/or have

admitted to participating in anticompetitive cartels involving technology-related or other products. To the extent that these prior instances of conspiratorial conduct involved consumer electronics products, the products in question were marketed through the same or related channels used for the marketing of ODDs and were overseen by the same divisions or departments within the relevant Defendant or co-conspirator for at least a portion of the Conspiracy Period.

165. *Optical Disc Licensing Policies*—In July 1994, the DOJ announced that it was conducting an investigation into the licensing practices of several leading companies that own and license CD manufacturing patents to determine if there have been violations of United States antitrust laws. The companies were believed to include Royal Philips and Sony. It was reported that the two companies signed a "pact" in the late 1970s, agreeing to "cross-license each other's basic patents on CD technology" and collect fees from vendors. It was further reported that the DOJ had issued subpoenas to several companies dealing with Royal Philips and Sony, including DiscoVision Associates, a subsidiary of Pioneer.

166. In August 2006, the European Commission (the "EC") initiated an investigation regarding the procedures required in order to obtain a license for BD and HD-DVD standards.

167. As noted above, in October 2008, it was announced that the TFTC fined two of the major players in the ODD market, Royal Philips and Sony, for their anticompetitive business practices in connection with their abuse of monopoly power in the licensing of the technology for CD-Rs.

168. *Magnetic Videotapes*—In November 2007, the EC fined Sony and various related entities and the Hitachi Maxell Limited joint venture $110 million for fixing the prices of professional videotapes sold in Europe between 1999 and 2002.

169.     ***Gas Insulated Switchgears***—In January 2007, the EC fined Hitachi and Toshiba for their roles in a conspiracy to control prices and allocate market shares in the market for gas insulated switchgears between 1988 and 2004.

170.     ***DRAM***—In October 2005, Samsung admitted guilt and paid a $300 million fine following a DOJ investigation into price-fixing among manufacturers of dynamic random-access memory ("DRAM").

171.     On May 19, 2010, the EC announced that it was fining ten companies a total of €331 million for participating in an international cartel to fix DRAM prices.  Among those fined were Hitachi, NEC, Samsung, and Toshiba.

172.     ***SRAM***—Samsung and Toshiba have acknowledged that the DOJ contacted them as part of an investigation for fixing prices of static random-access memory ("SRAM") and NAND flash memory.

173.     ***CRTs***—In a cease and desist order dated October 7, 2009, the Japan Fair Trade Commission (the "JFTC") levied $37.4 million in fines against five companies, including LG Philips Displays Korea Co. and an arm of the Samsung group and their affiliates, for alleged participation in a price-fixing cartel for cathode ray tubes ("CRT").

174.     Korea's Fair Trade Commission has fined more than five manufacturers of CRTs over $48 million.

175.     The EC imposed the biggest antitrust penalty in its history, fining seven companies a combined €1.47 billion ($1.92 billion) in connection with price-fixing of CRTs.

176.     In November 2007, Hitachi Canada Ltd., a subsidiary of Hitachi, received requests for information from the Canadian Competition Bureau with respect to alleged antitrust violations relating to CRTs.

177.     Since February 10, 2009, the DOJ has issued six indictments against individuals in connection with the CRT price-fixing conspiracy.  In May 2011, Samsung SDI Company Ltd. ("SDI"), a Samsung subsidiary, agreed to pay a $32 million criminal fine and pled guilty to charges brought under the Sherman Act.  Specifically, SDI admitted to participating in a conspiracy among major CRT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CRTs sold in the United States and elsewhere.

178.     *TFT-LCDs*—In December 2006, government authorities in Japan, Korea, the European Union, and the United States revealed a comprehensive investigation into anticompetitive conduct in the thin-film transistor liquid-crystal display ("TFT-LCD") market. On December 12, 2006, news reports indicated that LG, Hitachi, Samsung, and Toshiba, as well as LG Display Co., Ltd. ("LG Display"), an LCD joint venture between LG and Royal Philips, were all under investigation for price fixing TFT-LCDs.

179.     In December 2008, the DOJ announced that LG Display had pled guilty to a criminal information alleging price-fixing with respect to TFT-LCDs and had agreed to pay a $400 million fine.  The DOJ further announced that Sharp had pled guilty to bid-rigging with respect to certain customers of TFT-LCDs and had agreed to pay a fine of $120 million.

180.     On March 10, 2009, the DOJ announced that it had reached an agreement with Hitachi Displays, a subsidiary of Hitachi, to plead guilty to violations of Section 1 of the Sherman Act and to pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD products.  In its plea agreement, Hitachi Displays admitted to reaching agreements to fix the prices of LCD panels.

181.    Co-conspirator Samsung Electronics is in the DOJ's leniency program with respect to the investigation into the market for TFT-LCDs, meaning that it has admitted its participation in the cartel.

182.    In December 2008, the JFTC fined Hitachi and Sharp with respect to a conspiracy involving TFT-LCDs sold for use in Nintendo game consoles.

183.    As in the TFT-LCD industry, many of Defendants are not just the major manufacturers and sellers of ODDs, but are also vertically-integrated major manufacturers of products containing ODDs.  For example, the LG and Samsung entities manufactured and sold both TFT-LCD panels as well as TFT-LCD computer monitors and flat-panel televisions.  Here, Samsung, Sony, and Toshiba manufacture and sell both ODDs and computers containing ODDs.

184.    The ODD market has a similar oligopoly structure to that of the TFT-LCD, DRAM, and CRT industries.  Defendants' entry into price-fixing agreements in those markets— agreements which include many of the same foreign companies—supports the DOJ's investigation and other evidence showing the existence of anticompetitive conduct in the ODD market.

185.    The established illegal conduct of Hitachi, LG, Royal Philips, Samsung, Sharp, and Sony in a wide variety of product markets across the world, including the United States, is illustrative of Defendants' and their co-conspirators' respective corporate cultures, which encourage illegal activities aimed at furthering the company's bottom line at the expense of consumers.

186.    The facts as alleged herein show that the conduct of Defendants and their co-conspirators was directed both at customers in the United States and at United States import commerce for ODDs.  The conduct alleged herein was directed specifically at customers

throughout the United States, including HP in California and in Texas.  The conduct of

Defendants and their co-conspirators also had a direct, substantial, and reasonably foreseeable

effect on United States commerce of ODDs.  Defendants and their co-conspirators collectively

imported many millions of ODDs into the United States, which were purchased by persons and

entities in the United States, throughout the Conspiracy Period.  The collective monetary value of

such commerce was in the billions of dollars.

## FRAUDULENT CONCEALMENT

187.    Prior to at least October 26, 2009, HP did not have information sufficient to

constitute actual or constructive knowledge of the conspiracy alleged herein.  HP did not

discover, and could not have discovered through the exercise of reasonable diligence, sufficient

facts to show the existence of the conspiracy alleged herein.  Defendants and their co-

conspirators engaged in a secret conspiracy that did not give rise to facts that would put HP on

inquiry notice that there was a conspiracy to fix prices for ODDs.

188.    Because Defendants' and their co-conspirators' agreements, understandings, and

conspiracies were kept secret, HP was not aware before the announcement of the DOJ's

investigation on October 26, 2009 of Defendants' and their co-conspirators' unlawful conduct

alleged herein and did not know before that time that it was paying artificially high prices for

ODDs throughout the United States during the Conspiracy Period.

189.    Defendants and their co-conspirators wrongfully concealed and carried out the

affirmative acts alleged herein, including acts in furtherance of the conspiracy, in a manner that

precluded detection, in part by:

> a.    Agreeing not to discuss publicly or otherwise reveal acts and
>
> communications in furtherance of the price-fixing conspiracy;

b.   Agreeing to limit the number of representatives from each Defendant or co-conspirator that were aware of the price-fixing conspiracy;

c.   Agreeing to limit the written communications relating to or in furtherance of the price-fixing conspiracy;

d.   Agreeing to meet in furtherance of the price-fixing conspiracy in locations where the conspiracy was less likely to be detected;

e.   Coordinating bidding and price negotiation to avoid detection; and

f.   Giving false and pretextual reasons for ODD price stabilization and falsely describing the stabilization as the product of external causes and not collusion.

190.   By its very nature, Defendants' and their co-conspirators' price-fixing conspiracy was inherently self-concealing.

191.   In the context of the circumstances surrounding Defendants' and their co-conspirators' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' and their co-conspirators' pricing was conspiratorial.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' and their co-conspirators' ODD prices before October 26, 2009.

192.   HP could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because Defendants and their co-conspirators employed deceptive practices and techniques of secrecy to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

193.    Defendants and their co-conspirators also committed affirmative acts of concealment of the conspiracy, including, among other things, periodically issuing press statements falsely asserting that ODDs were competitively priced.  In October 2004, for example, Lite-On President Danny Liao claimed that increasing competition for OEM orders had pushed down prices for 16x DVD burners to as little as $60 and that competition would drive some manufacturers from the market.

194.    Defendants and their co-conspirators also concealed their collusive conduct by claiming pretextual reasons for the price levels of ODDs in response to customer requests to lower prices or in general statements to the trade.

195.    With respect to the bid-rigging activities described above, no participating Defendant or co-conspirator advised HP or the public of the collusive activity that was occurring in bidding to supply ODDs.  Instead, they made public statements that the ODD industry was intensely competitive, such as statements made in Hitachi's SEC Forms 20-F of August 20, 2004, August 26, 2005, August 7, 2006, June 26, 2007, and July 27, 2009; and NEC's SEC Forms 6-K of April 27, 2005 and May 31, 2005.

196.    In fact, in November 2011, HLDS, Inc. pled guilty to devising a scheme to defraud HP.  HLDS, Inc. admitted that the primary purpose of this fraudulent scheme was to submit collusive, noncompetitive, and rigged bids in an ODD procurement event that HP held. HLDS, Inc. specifically admitted that on or about April 22, 2009, it transmitted or caused to be transmitted an e-mail communication from its employee, located in Houston, Texas, to other participants in the fraudulent scheme, located in San Jose, California and in the Republic of Korea.  HLDS, Inc. specifically admitted that this e-mail communication conveyed non-public,

competitively sensitive information provided by its competitors that participated in the ODD procurement event that HP held.

197.    As a result of Defendants' and their co-conspirators' fraudulent concealment of their conspiracy, HP is entitled to recover for any claims that HP has as a result of the anticompetitive conduct alleged in this Complaint notwithstanding the statute of limitations.

198.    The statute of limitations is also tolled by the filing of various class action lawsuits shortly after the conspiracy was made public in October 2009, by ongoing government investigations, and by any other tolling available by operation of law.

## FIRST CAUSE OF ACTION

### (Violation of Section 1 of the Sherman Act)

199.    HP incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

200.    Beginning no later than January 1, 2004, the exact date being unknown to HP and exclusively within the knowledge of Defendants, Defendants and their co-conspirators agreed to stabilize the prices of ODDs sold in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

201.    Defendants and their co-conspirators participated in a price-fixing conspiracy during the Conspiracy Period.  The purpose and effect of this anticompetitive conspiracy was to fix, raise, stabilize, and maintain prices for ODDs.  Pursuant to this price-fixing conspiracy, Defendants and their co-conspirators engaged in a series of integrated and overlapping acts, including the rigging of bids for ODDs in procurement events conducted by certain OEMs, specifically including HP; the sharing of confidential information, including information on pricing, sales, production, bidding strategies and rankings, pull rates, and TAM, that facilitated

price coordination; cooperation agreements pursuant to which prices for ODDs sold in the
United States to both OEMs and non-OEMs were set; and allocating of customers and markets.

202.    HP paid higher prices for ODDs than it would have paid in a competitive market
as a direct result of Defendants' and their co-conspirators' unlawful conduct.

203.    The price-fixing conspiracy alleged herein caused the prices of ODDs that
Defendants and their co-conspirators sold to HP to be higher than they would have been but for
the conspiracy.

204.    The price-fixing conspiracy alleged herein was undertaken for the purpose and
with the effect of fixing, raising, stabilizing, or maintaining prices for ODDs, which caused
prices for ODDs to be maintained at supra-competitive levels.  The price-fixing conspiracy
alleged herein constitutes a per se violation of the federal antitrust laws and is an unreasonable
and unlawful restraint of trade.

205.    Defendants' and their co-conspirators' price-fixing conspiracy occurred in or
affected interstate and international commerce and involved U.S. import trade or commerce or
was within the flow of, was intended to, and did have a direct, substantial, and reasonably
foreseeable effect on Unites States domestic and import trade or commerce.

206.    The price-fixing conspiracy alleged herein had the following effects:

   a.   HP was deprived of the benefits of free, open, and unrestricted
        competition in the market for ODDs;

   b.   Competition in establishing the prices paid for ODDs was unlawfully
        restrained, suppressed, and eliminated; and

   c.   Prices charged to HP for ODDs were fixed, raised, stabilized, or
        maintained at higher, artificially inflated, noncompetitive levels.

207.    As a proximate result of Defendants' and their co-conspirators' unlawful conduct, HP has suffered injury to its business or property in that it paid higher prices for ODDs than it otherwise would have paid in the absence of the unlawful conduct of Defendants and their co-conspirators.

208.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, HP has sustained injury.  As a direct result of Defendants' and their co-conspirators' conduct, the injury that HP sustained is the payment of supra-competitive prices for ODDs.  This is an antitrust injury of the type that the federal antitrust laws were meant to punish and prevent.

**SECOND CAUSE OF ACTION**

**(Violation of the California Cartwright Act,
Cal. Bus. & Prof. Code §§ 16720, *et seq.*)**

209.    HP incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

210.    HP has a significant presence in California and maintains its worldwide headquarters in California.  HP conducted a substantial volume of business in California.  In particular, HP negotiated purchase prices and terms for ODDs from Defendants and their co-conspirators in California.  As a result of its presence in California and the substantial business it conducted in California, HP is entitled to the protection of the laws of California.

211.    Beginning no later than January 1, 2004, the exact date being unknown to HP and exclusively within the knowledge of Defendants, and continuing thereafter up to and including at least January 1, 2010, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of trade and commerce, as described above, in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq.*  Defendants have each acted in

violation of Section 16720 of the California Business and Professions Code, to fix, raise, stabilize, and maintain prices of and allocate markets for ODDs at supra-competitive levels. Defendants' and their co-conspirators' conduct substantially affected California commerce.

212.    For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth above and the following:  rigging bids for ODDs in procurement events conducted by certain OEMs, specifically including HP; sharing confidential information, including information on pricing, sales, production, bidding strategies and rankings, pull rates, and TAM, that facilitated price coordination; entering into cooperation agreements pursuant to which prices for ODDs sold in the United States, including in California, to both OEMs and non-OEMs were set; and allocating customers and markets.

213.    The combination and conspiracy alleged herein had the following effects:

a.   HP was deprived of the benefits of free, open, and unrestricted competition in the market for ODDs in California;

b.   Competition in establishing the prices paid for ODDs was unlawfully restrained, suppressed, and eliminated in California; and

c.   Prices charged to HP for ODDs were fixed, raised, stabilized, or maintained at higher, artificially inflated, noncompetitive levels in California.

214.    As a proximate result of Defendants' and their co-conspirators' unlawful conduct, HP has suffered injury to its business or property in that it paid higher prices for ODDs than it

otherwise would have paid in the absence of the unlawful conduct of Defendants and their co-conspirators.

215.    By reason of the foregoing, Defendants and their co-conspirators have entered into an agreement in restraint of trade in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq.*  In particular:

      a.  Defendants and their co-conspirators' conspiracy restrained, suppressed, and/or eliminated competition in the sale of ODDs in California and fixed, raised, stabilized, and maintained prices of ODDs in California at artificially high, noncompetitive levels;

      b.  As a result, Defendants' and their co-conspirators' conspiracy substantially affected California commerce;

      c.  As a direct and proximate result of Defendants' and their co-conspirators' conduct, HP has been injured in its business and property by paying more for ODDs manufactured by Defendants and their co-conspirators than it would have paid in the absence of Defendants' and their co-conspirators' combination and conspiracy; and

      d.  HP is therefore entitled to relief under California Business and Professions Code §§ 16720, *et seq.*

## THIRD CAUSE OF ACTION

**(Violation of the California Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

216.    HP incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

217.     HP has a significant presence in California and maintains its worldwide headquarters in California.  HP conducted a substantial volume of business in California.  In particular, HP negotiated purchase prices and terms for ODDs from Defendants and their co-conspirators in California.  As a result of its presence in California and the substantial business it conducted in California, HP is entitled to the protection of the laws of California.

218.     Beginning no later than January 1, 2004, the exact date being unknown to HP and exclusively within the knowledge of Defendants, and continuing thereafter up to and including at least January 1, 2010, Defendants and their co-conspirators committed and continued to commit acts of unfair competition, as described above, in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*  The unfair, unlawful, and/or fraudulent business acts or practices of Defendants and their co-conspirators, as described above, have caused HP to suffered injury to its business or property in that it paid higher prices for ODDs than it otherwise would have paid in the absence of those acts or practices.

219.     ***Defendants' Unfair Business Acts or Practices***—As described above, Defendants and their co-conspirators violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce.  Defendants and their co-conspirators illegally combined and conspired to fix, raise, stabilize, and maintain prices of and allocate markets for ODDs at supra-competitive levels.

220.     ***Defendants' Unlawful Business Acts or Practices***—As described above, Defendants and their co-conspirators violated Section 1 of the Sherman Act and the California Cartwright Act by entering into and engaging in a continuing unlawful trust in restraint of trade and commerce.  Defendants and their co-conspirators illegally combined and conspired to fix,

raise, stabilize, and maintain prices of and allocate markets for ODDs at supra-competitive levels.

221.    ***Defendants' Fraudulent Business Acts or Practices***—As described above, Defendants and their co-conspirators wrongfully concealed and carried out the affirmative acts alleged herein, including acts in furtherance of the conspiracy, in a manner that precluded detection, in part by agreeing not to discuss publicly or otherwise reveal acts and communications in furtherance of the price-fixing conspiracy and by giving false and pretextual reasons for ODD price stabilization and falsely describing the stabilization as the product of external causes and not collusion.  Defendants and their co-conspirators employed deceptive practices and techniques of secrecy to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.  These fraudulent acts of Defendants and their co-conspirators deceived HP.

222.    By reason of the foregoing, Defendants and their co-conspirators have engaged in unfair competition in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*  In particular:

> a.  Defendants and their co-conspirators committed acts of unfair competition, as defined by California Business and Professions Code §§ 17200, *et seq.*, by engaging in a conspiracy to fix and stabilize the prices of ODDs as described above;
>
> b.  Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices

within the meaning of California Business and Professions Code §§ 17200, *et seq*., including, but not limited to, violation of Section 1 of the Sherman Act and violation of the Cartwright Act;

c.  Defendants' and their co-conspirators' acts, omissions, misrepresentations, practices, and non-disclosures are unfair, unconscionable, unlawful, and/or fraudulent independently of whether they constitute a violation of the Sherman Act or the Cartwright Act;

d.  Defendants' and their co-conspirators' acts or practices are fraudulent or deceptive within the meaning of California Business and Professions Code §§ 17200, *et seq*.;

e.  Defendants' and their co-conspirators' conduct was carried out, effectuated, and perfected within California; and

f.  HP is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that Defendants or their co-conspirators may have obtained as a result of such business acts and practices, under California Business and Professions Code §§ 17200, *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, HP prays that the Court enter judgment on its behalf, adjudging and decreeing that:

A.  Defendants and their co-conspirators engaged in a contract, combination, and conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq.*, and the California Unfair Competition Law, Cal.

Bus. & Prof. Code §§ 17200, *et seq.*, and HP was injured in its business and property as a result of Defendants' and their co-conspirators' violations;

B.      HP shall recover damages it sustained, as provided by the federal and state antitrust laws, and a joint and several judgment in favor of HP shall be entered against Defendants in an amount to be trebled in accordance with such laws;

C.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and their respective officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on Defendants' behalf, shall be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

D.      HP shall be awarded pre-judgment and post-judgment interest, and such interest shall be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

E.      HP shall recover its costs of this suit, including reasonable attorneys' fees as provided by law; and

F.      HP shall receive such other or further relief as may be just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), HP demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: October 24, 2013

Respectfully submitted,

BECK REDDEN, L.L.P.

By: /s/ *Alistair B. Dawson*

      Alistair B. Dawson
      Federal I.D. No. 12864
      State Bar No. 05596100
1221 McKinney, Suite 4500
Houston, Texas  77010-2010
(713) 951-3700 (Phone)
(713) 951-3720 (Fax)

ATTORNEY-IN-CHARGE FOR PLAINTIFF
HEWLETT-PACKARD COMPANY

OF COUNSEL FOR PLAINTIFF:

Fred Bartlit, Jr. (pro hac vice to be filed)
fred.bartlit@bartlit-beck.com
Karma Giulianelli (pro hac vice to be filed)
karma.giulianelli@bartlit-beck.com
Lester Houtz (pro hac vice to be filed)
lester.houtz@bartlit-beck.com
Andre M. Pauka (pro hac vice to be filed)
andre.pauka@bartlit-beck.com
Daniel R. Brody (pro hac vice to be filed)
daniel.brody@bartlit-beck.com
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
1899 Wynkoop Street, Suite 800
Denver, CO 80202
Telephone:  (303) 592-3100

Mark E. Ferguson (pro hac vice to be filed)
mark.ferguson@bartlit-beck.com
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
54 West Hubbard Street
Chicago, IL 60610
Telephone:  (312) 494-4400